UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
JESSICA TORRES, AS ADMINISTRATOR OF                         :
THE ESTATE OF EDWIN JUNIOR                                  :
CARRINGTON,                                                 :     09 Civ. 9357 (LGS)
                                      Plaintiff,            :
                                                            :     **OPINION AND ORDER**
                    -against-                               :
                                                            :
THE CITY OF NEW YORK, POLICE OFFICER                        :
AARON KRULIK, SGT. SHUMON MAHBUB,                           :
AND LT. BRIAN HENNESSY,                                     :
                                                            :
                                      Defendants.           :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/11/2016

LORNA G. SCHOFIELD, District Judge:

This action, brought by Jessica Torres in her capacity as Administrator of the Estate of Edwin Junior Carrington (the "Estate") against the City of New York (the "City"), as well as Police Officer Aaron Krulik, Sergeant Shumon Mahbub, and Lieutenant Brian Hennessy (the "Individual Defendants") (together, with the City, "Defendants"), arises out of an April 2009 incident in Carrington's apartment building to which the defendant officers responded.[1] The Estate brings a federal claim for false arrest under § 1983 of Title 42 of the United States Code, as well as claims under New York law for false imprisonment, negligence, and wrongful death.[2] Defendants move for summary judgment on all claims pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motion is granted in part and denied in part.

---

[1]   This action, filed November 12, 2009, was stayed between March 19, 2013 and June 29, 2015, pending a Queens County Surrogate's Court proceeding concerning the administration of Carrington's estate.

[2]   The Estate, in its memorandum of law in opposition to the motion, has withdrawn all other claims alleged in its Third Amended Complaint.

I.     **BACKGROUND**

All facts below are taken from Defendants' statement of material facts, the Estate's counter-statement of material facts, and the parties' submissions in connection with this motion. This Section recites only those facts relevant to deciding this motion.

   **A. Carrington's Arrest**

On the evening of April 16, 2009, Carrington -- along with his co-habitants, his uncle Johnny Banks and aunt, Lucinda Norman -- were in their apartment. A friend of Banks', Krystal James, also was visiting. *See id.* ¶ 3. Seconds after James left the apartment, Banks heard gunshots and opened the apartment door to find James bleeding in the hallway. Banks dragged her back into the apartment, and Carrington called 9-1-1.

Defendants Hennessy, Krulik, and Mahbub responded to the 9-1-1 call at approximately 3:20 AM on April 17, 2009. The apartment's front door was open when the officers arrived. Hennessy saw James lying on the ground at least partially inside the apartment and observed shell casings in the hallway outside the apartment. Bloodstains were visible in the hallway and on the apartment's front door mat and living room floor.

The officers entered the apartment at Banks' invitation, and found Carrington and Banks standing on either side of James. Hennessy testified at his deposition that, although he had asked Carrington and Banks to recount what had happened to James, neither responded to his questioning and both repeatedly ignored his requests to move away from the crime scene. Banks disputes this characterization and testified at his own deposition that he had, in fact, answered Hennessy's questions and that Hennessy never instructed Carrington tor Banks to step back from the crime scene.

Hennessy further testified that, per his regular practice when he encounters uncooperative

2

witnesses at a shooting scene, he ordered warrant checks to be run on Carrington and Banks. Hennessy said that he ordered these warrant checks within minutes of entering the apartment. Hennessy further testified that the warrant check on Carrington revealed two open warrants. Krulik testified during his deposition that he was the officer responsible for conducting the warrant checks, and that he did so from the crime scene via either radio or phone.

After Banks helped to take James downstairs by stretcher, he was arrested on the charge of Obstructing Governmental Administration, a violation of Section 195.05 of the New York Penal Law.  At some point while the officers were at the crime scene, Carrington also was placed under arrest.  Hennessy testified that Carrington's arrest was made only after his two open warrants were discovered, and that Carrington was arrested on the basis of the warrants as well as the additional charge of Obstructing Governmental Administration.  Carrington's April 17, 2009, arrest report, time-stamped 04:40:00, states:  "Defendant refused to cooperate [with] police investigation, impeding investigation by withholding information of perpetrator in regards to earlier violent crime.  Upon further investigation [defendant] has two open warrants, 2009SQ001040, 2009SQ00137."

### B. Carrington's Incarceration and Release

After arrest, Carrington and Banks were taken to the 114th Precinct, where they spent approximately one hour in a cell with one other individual.  Both were then transported to Queens Central Booking ("QCB"), where they were seen by medical personnel.  Banks testified that he was not given a physical exam at QCB, but was only asked several questions about his health.  Banks and Carrington were then transferred between at least six different cells at QCB. Each of these cells held between five and fifteen people.  Banks and two other individuals who had been held at QCB on the same day testified that the cells were overcrowded and unsanitary,

such that inmates were exposed, in close quarters, to bodily fluids and other waste.  These other individuals also testified that they were not administered physical medical exams at QCB.

At a hearing on April 19, 2009, Judge Anthony Ferrara of the Queens County Criminal Court dismissed with force two docket items against Carrington:  (1) 2009SQ001040 (no vaccine) and (2) 2009SQ001037 (unlicensed dog).  Carrington subsequently was released from custody.

After his release, Carrington returned to his job at Pep Boys, where he worked as a mechanic.  In that role, Carrington interacted with approximately twelve other mechanics and five to six customers each day.  Carrington exhibited no symptoms of illness while at work on April 20 and 21, 2009.  On the morning of April 22, 2009, however, Carrington appeared pale, trembling, and sweaty.  Mid-day on April 23, 2009, Carrington fell unconscious and was rushed to the hospital by ambulance.  Carrington was pronounced dead at 6:33 PM that evening.  The autopsy conducted by the Medical Examiner's Office identified the cause of death as septic shock related to Neisseria Meningitidis (Fulminant Meningococcemia) Infection, a form of meningitis.

The Estate's expert, Dr. Wilfredo Talavera, submitted an affidavit opining that:

> Neisseria Meningitis is a bacterium that is a respiratory pathogen and spread is more likely by the aerosol route.  This infection tends to occur and spread more quickly when larger groups of people are together.  High attack rates occur in the setting of crowded conditions, poor sanitation and other conditions such as malnutrition. . . . Although first appreciated with experience in military recruits, prison inmates, intimate contact of cases including family members, college roommates, and nursery school classmates are also at increased risk of developing this infection. . . . . It is my opinion within a reasonable degree of medical certainty that Mr. Carrington's death . . . was the direct result of the crowded and unsanitary conditions of the prison during his 60 hour detention.

Dr. Talavera's opinion on causation was based on "[t]he fact that [Carrington's] illness began 3 days after his release, his death occurring one day later, his lack of other exposure to this organism and the historical connection between Meningococcemia and incarceration." Dr. Talavera also testified that, in most cases, the incubation period for the infection is "between two and five days."

## II.     LEGAL STANDARD

Summary judgment is appropriate where the record before the Court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *See id.* at 255.

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

### A. False Arrest and Imprisonment Claims

The Estate's federal false arrest claim and state false imprisonment claim are considered together because "[a] § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Under both federal and New York law, the existence of probable cause -- including probable cause based on an outstanding warrant -- is a complete defense to a false arrest claim. *See id.*; *Andersen v. F.B.I.*, No. 98 Civ. 4782, 2001 WL 35922308, at *12 (E.D.N.Y. July 20, 2001) (explaining that under New York law, "[a]n arrest is privileged if it is made pursuant to a lawful warrant") (citing *Collins v. Brown*, 129 N.Y.S.2d 538, 540 (App. Div. 3d Dep't 1987)); *Jones v. Trump*, 971 F. Supp. 783, 788 (S.D.N.Y. 1997) ("Where an arrest is made pursuant to a warrant, there can be no [Section 1983] claim for false arrest or unlawful imprisonment."). Because the undisputed record establishes that Carrington was arrested on open warrants, there is no triable issue of fact on the Estate's false arrest and imprisonment claims.

To support their position that the officers had probable cause to arrest Carrington, Defendants point to various parts of the record, including Hennessy and Krulik's deposition testimony that they conducted a warrant check on Carrington at the crime scene on April 17, 2009, and that Carrington was taken into custody only after his open warrants were discovered. Likewise, Defendants note that Carrington's April 17, 2009, arrest report indicates that he was arrested pursuant to open warrants 2009SQ001040 and 2009SQ00137 (as well as on a new Obstruction of Governmental Administration charge). Additionally, Defendants cite

Carrington's April 19, 2009, hearing, at which warrants 2009SQ001040 and 2009SQ00137 were dismissed with force.

The Estate incorrectly argues: "there is absolutely no evidence that we can find that there actually was an open warrant for Carrington's arrest." To defeat summary judgment, the opposing party must establish a genuine issue of fact by actually "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright*, 554 F.3d at 266. The Estate fails to make this showing. Rather, the Estate simply speculates that because Defendants have not produced the authenticated warrant documents themselves, Defendants may also have fabricated their narrative about running the warrant check and finding open warrants in Carrington's name. Such conjecture -- unsupported by any evidence from the record -- does not create a genuine factual dispute regarding the legality of Carrington's arrest.

To the extent the Estate challenges any detention of Carrington before the officers' discovery of the open warrants, that brief detention was justified as a matter of law by the exigent circumstances of the shooting and the officers' need to investigate. *See United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) ("A government law enforcement agent may subject an individual to an investigative stop upon a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity. . . . The agent is said to have a reasonable suspicion when he is in possession of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 88 (1968)). In this case, factors such as the 9-1-1 call, shell casings and bloodstains in and around the apartment, and victim's injuries would have justified the investigative stop of individuals at the scene. Having held that no reasonable jury could find Defendants liable for false arrest, this opinion does not address the parties' remaining arguments

regarding liability and qualified immunity.

### B. Negligence and Wrongful Death Claims

The remaining claims for negligence and wrongful death arise under New York law and seek to hold all Defendants liable for Carrington's death from meningitis, based on the conditions of Carrington's incarceration at QCB. These claims are dismissed against the Individual Defendants as the Estate has proffered no evidence from which a reasonable jury could find that they were responsible for the offending prison conditions. Issues of fact preclude dismissal of these claims against the City, and the Court has supplemental jurisdiction over these claims despite the dismissal of the federal claim upon which subject matter jurisdiction was based.

To prevail on a claim for negligence or wrongful death under New York law, a plaintiff must establish, *inter alia*, that the defendant breached a duty to plaintiff and that defendant's breach proximately or substantially caused plaintiff's injury. *See King v. Crossland Sav. Bank*, 111 F.3d 251, 255 (2d Cir. 1997) (claim for negligence requires "(1) that the defendant owed the plaintiff a cognizable duty of care, (2) that the defendant breached that duty, and (3) that the plaintiff suffered damages as a proximate result of that breach"); *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 298-99 (S.D.N.Y. 2014) (claim for wrongful death requires, *inter alia*, "(1) the death of a human being, [and] (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, . . . [which may be demonstrated] by showing that a defendant's acts or omissions were a substantial cause of the events . . . produc[ing] the injury") (quotation marks and citations omitted). With respect to the Individual Defendants, the Estate's negligence and wrongful death claims are dismissed because the Estate has failed to proffer any evidence that Krulik, Mahbub, or Hennessy had any involvement in creating or overseeing the

conditions at QCB.  As asserted against the City, however, genuine issues of material fact preclude summary judgment on these claims.

Contrary to Defendants' argument that the Estate has no evidence that the City should have known that the conditions of Carrington's confinement created the risk that he would contract meningitis or that Carrington contracted meningitis in QCB, the Estate has presented evidence such that a reasonable juror could find in its favor.  In particular, the Estate has proffered expert testimony regarding the transmission of and incubation period for meningitis that supports the possibility that Carrington contracted the disease while at QCB.  The Estate also has proffered testimony from Banks and other individuals incarcerated at QCB around the same time as Carrington attesting to the visibly crowded and unsanitary conditions of their incarceration, as well to as the fact that they did not receive physical medical exams at QCB.  Defendants respond with competing facts -- including evidence that QCB inmates receive some form of medical evaluation and the possibility that Carrington was infected by someone outside of QCB and -- generating precisely the type of factual dispute that cannot be decided on summary judgment.  Thus, viewing the evidence in the light most favorable to the Estate, Defendants' motion for summary judgment on the negligence and wrongful death claims against the City is denied.

Although all federal claims have been dismissed, the circumstances of this case do not warrant dismissal of the state claims, in effect requiring them to be refiled in state court.  This case has been pending for nearly seven years.  All discovery and motion practice is complete, and the matter is ready for trial.  Courts may decline to exercise supplemental jurisdiction over state law claims under certain circumstances, including when "the district court has dismissed all claims over which it has original jurisdiction," *see* 28 U.S.C. § 1367(c)(3), but this decision is a

matter for the court's discretion.  *See Oneida Indian Nation v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011) (citing *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)).  In deciding whether to retain jurisdiction over state court claims, courts must weigh "[judicial] economy, convenience, fairness, and comity."  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).  "Although these factors will usually lead to dismissal of the state law claims when the federal claims have been dismissed at a relatively early stage, a court may properly retain supplemental jurisdiction when all that remains is trial."  *Hernandez v. PFIP, LLC*, No. 14 Civ. 4069, 2015 WL 7758875 at *7 (citing *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990)).  In this case, the interests of justice weigh in favor of retaining jurisdiction over -- and facilitating the expedient resolution of -- the remaining state claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The Estate's federal false arrest claim and state false imprisonment claim are dismissed against all Defendants, and its state claims for negligence and wrongful death are dismissed against the Individual Defendants.  The Court retains supplemental jurisdiction over the negligence and wrongful death claims as asserted against the City.  The Clerk of Court is respectfully directed to close the motion at Docket No. 90.

SO ORDERED.

Dated:  July 11, 2016
        New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**